UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. 14-284 |
| v. | * | SECTION: "H" |
| DARREN SHARPER | * | |
| | * * * | |

## FACTUAL BASIS

If this case were to proceed to trial, the Government would prove the defendant's guilt beyond a reasonable doubt through the introduction of admissible evidence and the testimony of competent witnesses. More specifically, the evidence would establish the following:

In February 2013, the defendant and Brandon Licciardi were acquainted and were aware that each was providing controlled substances to unsuspecting women and then having sexual relations with them without their consent. Licciardi was employed as a Deputy Sheriff with the St. Bernard Parish Sheriff's Office. On February 1, 2013, V1 was working as a model for the sponsor of a Super Bowl Party at an establishment in the French Quarter. While at the party she met Brandon Licciardi. V1 drank alcoholic beverages at the party. The government will prove that during the party, Licciardi provided MDMA (ecstasy) Alprazolam (Xanax) and Diazepam (Valium) to V1 in an alcoholic beverage without her knowledge. V1 remembers having an alcohol drink in her hand at the party but remembers nothing else except later being in a shower with a person she later identified as Brandon Licciardi. After Licciardi drugged V1, he brought V1 to the defendant's condo in the Warehouse District of New Orleans with the intent to have sex with her and to provide the defendant with the opportunity to have sex with her. While at the condo, Licciardi had sex with V1. The defendant thereafter attempted to have sex with her but

did not. The defendant was aware that she had been drugged by Licciaridi with the intent to thereafter have sexual relations with her.

V1 next remembers waking up naked in a bed with a man she has since identified as the defendant. She knew immediately that she had sexual intercourse at some point during the evening. She did not knowingly consent to have sex with either individual. She found her clothes in the bathroom and left the condo which was later identified as the condo of the defendant. When she reached the street, she called a friend who came and got her. She told him that she did not know what happened but that she may have been drugged. Cell site information was obtained in this matter by the FBI pursuant to a court order. It showed that on the night/morning that V1 was raped, the cell phones of Licciardi and Sharper were both at the location of the party at 2:30 am and were together in the Warehouse District where Sharper's condo is located, between 3:15 am and 5:48 am on February 2, 2013.

On September 22, 2013, V2 went to a Saints game. Afterward, she went to dinner with friends, and then to the Warehouse District of New Orleans where she met other friends. They eventually went to a bar named Ohm where an "after game party" was occurring. Ohm is located very near the defendant's condo. An after game party was occurring. Some New Orleans Saints football players were in attendance as was the defendant and Licciardi. V2 was a friend of Licciardi at the time and knew him to be a friend of the defendant, though she had never met him. She began talking to Licciardi and he introduced her to the defendant. She was not intoxicated at the time. Licciardi introduced her to the defendant so as to provide him with the opportunity to drug her and later have sex with her. She, Licciardi, Sharper and several other persons left and went to a club called Republic but it was closed. The defendant then drove her and Licciardi to Jax which is a club in the French Quarter. While at Jax, the defendant provided

2

ecstasy to V2 without her knowledge by putting it in her drink It was his intention that he would then have sex with V2. V2 remembers standing by a VIP table and that the defendant gave her a drink. She did not see him make it. Licciardi was aware that the defendant had put the ecstasy in the drink for the sole purpose to have sex with V2. Licciardi indicated that he was leaving and going home. V2 remembers not wanting to remain at Jax as she did not know the defendant. Licciardi indicated that he was going to leave and return to his home in Chalmette. He refused to take her to her home in Kenner.

On the evening of September 22 2013, Stafford was working as the manager of a French Quarter night club in the 700 block of Bourbon Street called Bourbon Heat. After the club closed at about midnight, he took his staff to Jax Brewery. When he entered the bar area on the second floor, he saw his friend, V2. Stafford is also a friend of Licciardi. He then purchased a round of drinks (shots) for his staff and V2. When he handed the drink to V2, V2 appeared disoriented and confused to him. She did not drink her shot but instead meandered in a manner he found disturbing. V2 appeared to be with the defendant so Stafford asked the defendant if V2 was alright and he replied, "She's ready, she's on the potion." Stafford believed the "potion" was a combination of ecstasy and Ambien. Stafford told the defendant that he did not like the way V2 looked to which he said "she's ready". The defendant then took V2 by the hand and led her from the bar.

V3 was at Jax Brewery on the evening of September 22, 2013. While at Jax, she met Eric Nunez, a person she had known for several years. Nunez is also a friend of the defendant and is known to Licciardi. When her girl friend who had come to Jax with her wanted to leave with her (the girlfriend's) date, she asked Nunez if he would give her a ride home. Nunez texted her asking if she was ready to leave with him, which she did. The text occurred at approximately

3

2:50 AM on September 23, 2013  She met up with Nunez, Sharper and a blonde female she did not know, later identified as V2.   They departed Jax Brewery in Sharper's car.  Sharper drove and Nunez sat in the front passenger seat.  V3 and V2 were in the back seat. V3 believed Sharper was taking them to where Nunez had parked his car.  Instead, they arrived in a parking garage in an unknown location which was later identified as the defendant's parking garage.  She recalled stepping out of the car, and helping V2, who seemed very unsteady.   All four entered the defendant's condo.  Once inside, the defendant, put Zolpidem (Ambien) in the drink of V3 without her knowledge or consent.  The defendant had previously put MDMA ("Ecstasy") in a drink of V2 without her knowledge or consent.  Thereafter, the defendant and Nunez had sexual intercourse with V2 and V3 while they were incapacitated.

After V2 left Jax with the defendant, Stafford called Licciardi who was then home.  Stafford told Licciardi that he had seen V2 leave with the defendant and that she appeared drugged.  As he was aware that Licciardi and the defendant were friends and that Licciardi was a law enforcement officer, he asked Licciardi to go the defendant's condo and determine whether V2 was in need of assistance.  Licciardi agreed and arrived a short time later at the defendant's condo.  He was driving his police vehicle.  Stafford arrived shortly thereafter.  Licciardi entered the condo on three occasions and was aware that V2 had been drugged and that the defendant had sex with V2.  He spoke with Stafford and falsely assured him that nothing was amiss and that the victims were not in any danger or trouble.

V2 remembers nothing that occurred after Jax until she awoke naked in the defendant's condo at 10:00 am, with defendant lying on top of her.  She told him to stop and he did.  He called her a cab.  She felt disoriented.  She found her clothes, dressed and went outside.  There were cabs across the street at the Renaissance Hotel and she took one to her car.  She was certain

4

that she had sex. When she arrived home, she immediately went to sleep. V2 did not knowingly consent to have sex with the defendant, Licciardi or Nunez.

She contacted Stafford who told her that he and Licciardi had visited the condo during the early morning hours. He told her that she needed to go to the hospital and get examined. He also told her that Nunez had been at the condo. Later, she texted Nunez and asked him if she fell down. He said no and then, in a series of text messages, indicated that she had sex with Sharper as well as a second woman that was at the condo. It is clear from the text messages that she did not remember what occurred at the condo and was unaware that a second woman was present. At midnight on Tuesday, she went to the hospital to have a rape kit done. V2 also made a report to the NOPD.

V3 remembers nothing else until the next morning when she awoke naked. She was disoriented but saw a naked black male later identified as the defendant walk into the room. V3 was next aware that the defendant was on top of her and having sexual intercourse with her. It lasted "a couple of minutes." She felt numb and disoriented. Afterward, the defendant left the room and she again lost consciousness and awoke later in the same unknown bedroom. She was very alarmed and disoriented and was experiencing pain on her face. She did not know where she was. V3 was still naked but located her clothing in the same room. She dressed and texted Erik Nunez at approximately 7:50 am, on September 23rd, 2013, in an attempt to determine what happened but he did not immediately reply. She exited the bedroom and walked through the apartment. She found a locked door she assumed was a bedroom, but apparently no one was present. She then called her friend who stated she would come get her. V3 did not know where she was but was able to utilize the GPS function on her phone to establish her location. Her friend came and picked her up.

The Federal Bureau of Investigation Crime Laboratory conducted testing on the hair of V1 and V3 using advanced detection technologies to determine the presence of certain drugs after ingestion has occurred and there has been a passage of time. This is a test of inclusion and not exclusion, that is, a positive result shows a certain substance was ingested but a negative result does not rule out that ingestion did occur. This testing revealed that the V1 tested positive for the presence of Alprazolam (Xanax), clonazepam, 7-Aminoclonazepam, diazepam (Valium), nordiazepam (Valium Metabolite) and that V3 tested positive for the presence of Zolpidem (Ambien). An expert would testify that these drugs are used as date rape drugs and that they cause victims to have blackouts, memory loss and an inability to make rational or reasoned decisions. Ingestion of these drugs will also cause a loss of social restraints and cause the victims to engage in sexual behavior in which they would not normally engage.

The Louisiana State Police Crime Laboratory conducted DNA testing on a strain on the blue jeans of V2 which she wore on the night of the sexual assault and which were seized by the New Orleans Police Department. A DNA profile was also developed from a swab taken form the defendant. Testing revealed that stain had a mixture of three contributors, one major and two minor. The DNA profile obtained from the major contributor of that stain was consistent with the DNA profile of the defendant. A DNA profile was developed from a perineal swab taken from V2 during her rape examination. This profile was consistent with the DNA profile of the defendant.

Cell site information was obtained in this matter. It showed that on the night/morning that V1 was raped, the cell phones of Licciardi and Sharper were both at Jax at 2:30 am and were together in the Warehouse District where Sharper's condo is located, between 3:15 am and 5:48 am.

A security camera video was obtained for the parking garage of the defendant's condo complex. It is date/time stamped 3:00 am, September 23, 2013. The video shows the defendant, Nunez, V2 and V3 get out of the Range Rover. V3 assisted V2. The defendant appeared very unsteady. The four of them appear in view of the cameras walking from the garage to an elevator then getting off the elevator and crossing a hall to enter the defendant's residence.

Kenneth Allen Polite, Jr.
United States Attorney

_____  05.29.15
Mark A. Miller                Date
Assistant United States Attorney

_____  5/29/15
Michael E. McMahon            Date
Assistant United States Attorney

_____  _____
Darren Sharper                Date
Defendant

_____  5/29/15
Kyle Schonekas                Date
Attorney for Defendant

7